

Oct 24, 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**14-80201-CR-HURLEY/HOPKINS**

Case No. _____
16 U.S.C. § 1538(a)(1)(E), (F), and (c)
16 U.S.C. § 3372(a)(1) and (a)(4)
16 U.S.C. § 3373(d)(1)(B)
18 U.S.C. § 371
18 U.S.C. § 554
18 U.S.C. § 2

UNITED STATES OF AMERICA

v.

ELITE ESTATE BUYERS, INC. d/b/a
ELITE DECORATIVE ARTS and
CHRISTOPHER HAYES,

　　　　　　　　　**Defendants.** /
_____

### INFORMATION

Conspiracy to Traffic Protected Wildlife
(18 U.S.C. § 371)

The United States Attorney charges that:

### BACKGROUND

At all times material to this Information:

1.　Defendant **ELITE ESTATE BUYERS, INC. d/b/a ELITE DECORATIVE ARTS** (hereinafter "ELITE" or "the Company"), was incorporated under the laws of the State of Florida, and was located at 1034 Gateway Boulevard, Suite 106, Boynton Beach, Florida 33426, in the Southern District of Florida.

2. Defendant **CHRISTOPHER HAYES** ("**HAYES**"), together with others, owned and operated **ELITE** as an auction house.

3. **ELITE** and **HAYES** were in the business of accepting items on consignment and selling those items to winning bidders through auction. The defendants also sold consigned items directly to individuals through private sales. **HAYES** represented himself to be an expert in Asian antiques, including objects made from rhinoceros horn and elephant ivory.

4. "T.H." was an employee of **ELITE**. Together with others, T.H. managed **ELITE**'s day-to-day business, met with potential and actual consignors, and prepared consignment contracts.

5. "S.C." was an independent contractor paid by **ELITE**. Together with others, S.C. prepared auction catalogues, uploaded catalogues to **ELITE**'s website, created and prepared records used in **ELITE**'s business, responded to inquiries about catalogue and website items from potential bidders, appraised items consigned to **ELITE**, and printed invoices for items purchased at auction or by direct sale.

6. "T.E." was an independent contractor paid by **ELITE**. Together with others, T.E. responded to inquiries about catalogue and website items from potential bidders, and received payment information and payments from buyers.

7. "J.B." was an independent contractor paid by **ELITE**. Together with others, J.B. issued checks to consignors.

8. "B.A" was an independent contractor paid by **ELITE** to photograph items for **ELITE**'s catalogue and website.

9. "Shipper-1" and "Shipper-2" were businesses engaged in the domestic and international shipment of items, including items sold by **ELITE** through auctions and private sales. **ELITE**'s website designated Shipper-1 and Shipper-2 as "Preferred Shippers."

10. The **ELITE** employees and independent contractors identified above, as well as Shipper-2, were co-conspirators known to the United States Attorney.

11. "CC-1" and "CC-2," whose identities are known to the United States Attorney, were involved in the business of purchasing Asian art and antiques in the United States for customers in China, including objects made from rhinoceros horn and elephant ivory, and arranging for those items to be smuggled out of the United States and into Hong Kong and China.

## Regulation of Trade in Endangered Species

12. The Endangered Species Act ("ESA"), Title 16, United States Code, Sections 1531 *et seq.*, was enacted by Congress to conserve endangered and threatened species and the ecosystems upon which they depend.

13. The term "fish or wildlife" means any member of the animal kingdom, including without limitation any mammal, fish, bird, amphibian, reptile, mollusk, crustacean, arthropod, or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof. Title 16, United States Code, Section 1532(8).

14. The term "endangered species" means any species, or part thereof, which is in danger of extinction throughout all or a significant portion of its range. Title 16, United States Code, Section 1532(6).

15. The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. Title 16, United States Code, Section 1532(20).

16. All species determined to be endangered under the ESA are listed in Title 50, Code of Federal Regulations, Section 17.11. The Black rhinoceros (*Diceros bicornis*) is a species of rhinoceros native to eastern and central Africa. The Black rhinoceros was listed as an endangered species in July 1980. 45 Fed. Reg. 47352, 47354.

17. Rhinoceros are characterized by their enormous size, leathery skin and horns. Rhinoceros horn is prized in some cultures for its alleged medicinal value or for its use as carved art objects. Illegal hunting resulting from the international demand for rhinoceros horn is a major threat to the survival of the species. Libation cups and other ornamental carvings made from rhinoceros horn are particularly sought-after in China and other Asian countries, as well as in the United States. The escalating value of these items has resulted in an increased demand for rhinoceros horn, and has helped to foster a thriving black market, which includes modern carvings being sold as antiques. Most species of rhinoceros are extinct or on the brink of extinction as a result of this thriving black market.

18. The ESA makes it unlawful to knowingly deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, endangered species of fish and wildlife, including Black rhinoceros. The ESA also

4

makes it illegal to sell and offer to sell endangered species of fish and wildlife, including Black rhinoceros, in interstate and foreign commerce. Title 16, United States Code, Sections 1538(a)(1)(E) and (F) and 1540(b)(1).

19.     The Convention on International Trade in Endangered Species (CITES) is an international agreement, to which the United States is a party, which entered into force in 1975. CITES regulates the international trade and transport of species that are threatened with extinction (Appendix I), species that are not currently threatened with extinction, but would become so absent regulation (Appendix II), and species for which a member country requests assistance in controlling trade (Appendix III). CITES is implemented in the United States as part of the ESA, Title 16, United States Code, Sections 1537a-1538, and through regulations found at Part 23 of Title 50 of the Code of Federal Regulations.

20.     The Asian elephant (*Elephas maximus*) is a species of elephant native to south-central and southeastern Asia. The Asian elephant is listed in Appendix I of CITES, and was listed as an endangered species in June 1976. 41 Fed. Reg. 24064. The African elephant (*Loxodonta africana*) is a species of elephant native to eastern and central Africa. The African elephant is listed in Appendix I of CITES, though certain populations of African elephants (specifically those from South Africa, Namibia, Botswana, and Zimbabwe) are listed in Appendix II, accompanied by a special annotation allowing only non-commercial international trade in specimens of those populations. The African elephant was listed as a threatened species under the ESA in May 1978. 43 Fed. Reg. 20504.

5

21. It is unlawful to commit, attempt to commit, or cause to be committed, the import or export, or to engage in international trade, of any specimen of a species listed in Appendix I, II, or III of CITES without required authorizing CITES documents. Title 50, Code of Federal Regulations, Sections 17.21(b), 17.40(e)(2)(i), and 23.13(a) and (d). Under CITES, commercial trade in Appendix I species is almost entirely prohibited, consequently, authorizing documents are not available.

22. The Lacey Act makes it unlawful for a person to, *inter alia*, engage in conduct that involves the sale or purchase, or attempted sale or purchase in interstate or foreign commerce of wildlife with a market value in excess of $350.00, knowing that the wildlife was taken, possessed, transported or sold in violation of or in a manner unlawful under a law or regulation of the United States. Title 16, United States Code, Sections 3372(a)(1) and (a)(4), 3373(d)(1).

23. Beginning on an unknown date, but at least as early as on or about January 18, 2011, and continuing through on or about March 31, 2013, in Palm Beach County, in the Southern District of Florida and elsewhere, the defendants,

**ELITE ESTATE BUYERS, INC. d/b/a
ELITE DECORATIVE ARTS
and
CHRISTOPHER HAYES,**

willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combined, conspired, confederated, and agreed with others known and unknown to the United States Attorney, to commit certain offenses against the United States, that is:

(a) to knowingly transport, sell, receive, and acquire, any wildlife with a market value of more than $350.00, knowing that it was transported and sold in violation of the Endangered

6

Species Act (Title 16, United States Code, Sections 1538(a)(1)(E) and (F) and 1538(c)), in violation of the Lacey Act (Title 16, United States Code, Sections 3372(a)(1), 3372(a)(4), and 3373(d)(1)(B)); and

(b) to knowingly receive, conceal, buy, sell, and in any manner facilitate the transportation, concealment, and sale, of horns from Black rhinoceros and objects made from same and ivory from African and Asian elephants, prior to exportation, knowing the same to be intended for exportation contrary to the Endangered Species Act (Title 16, United States Code, Sections 1538(a)(1)(G) and 1538(c)) and U.S. Export Regulations (Title 13, United States Code, Section 305(a)), in violation of Title 18, United States Code, Section 554.

## Manner and Means of the Conspiracy

The manner and means by which the defendants sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

24. In furtherance of the conspiracy and to effect the illegal objects thereof, the defendants and their co-conspirators received horns from Black rhinoceros in the course of commercial activity, and advertised those horns for sale at auction to potential buyers outside the State of Florida and outside the United States. In addition to advertising for sale at auction, the defendants sold horns from Black rhinoceros and objects made from same directly to individuals who the defendants knew resided outside the State of Florida and outside the United States. Following these sales, the defendants and their co-conspirators transported, aided and abetted in the transport, and attempted to transport, the horns and objects, knowing that their receipt, acquisition, and sale of the horns and objects violated United States law.

7

25. In furtherance of the conspiracy and to effect the illegal objects thereof, the defendants and co-conspirators worked with privately-owned shipping companies that assisted purchasers to transport horns from Black rhinoceros and objects made from same, from the State of Florida to other states within the United States.

26. In furtherance of the conspiracy and to effect the illegal objects thereof, the defendants and co-conspirators worked with privately-owned shipping companies, which assisted purchasers to smuggle wildlife and objects made from wildlife, including but not limited to rhinoceros horn, elephant ivory, and objects made from same, from the United States.

## Overt Acts

In furtherance of the conspiracy, and to effect the objects and purposes thereof, there were committed and caused to be committed by at least one of the co-conspirators, within the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

Interstate Sale of Black Rhinoceros Horn to CC-1

1. On or about January 30, 2012, in Boynton Beach, Florida, the defendants received and accepted consignment of an un-carved Black rhinoceros horn from "M.B.," an individual who resided in Plantation, Florida.

2. On or about February 7, 2012, the defendants advertised via "Online Auctions," an internet-based auction database, that the horn the defendants received from M.B. on January 30, 2012, would be sold at auction on March 18, 2012, for an "estimated price" of $50,000 to $60,000. The advertisement described the horn as "Lot 501, Huge Rhinoceros Horn Antique."

8

3. On or about March 19, 2012, at Boynton Beach, Florida, the defendants sold Lot 501 (the horn received from M.B. on January 30, 2012) through a "private" or "straight" sale (not at auction) to CC-1, a Texas resident, for $70,000.

4. Between on or about March 19, 2012, through on or about April 12, 2012, the defendants received bank deposits in the name of CC-1, totaling $80,500 ($70,000 sale price plus a 15% "buyer's premium" to **ELITE**) for the sale of the horn the defendants received from M.B. on January 30, 2012.

Interstate Sale of Black Rhinoceros Horn to Undercover Agent

5. On or about May 14, 2012, in Boynton Beach, Florida, the defendants received and accepted consignment of an uncarved Black rhinoceros horn from "A.W.," an individual who resided in New York, New York.

6. On or about June 24, 2012, in Boynton Beach, Florida, the defendants sold the horn received from A.W. as Lot 600, "Antique African Huge Rhinoceros Horn," for a winning bid of $69,000 ($60,000 plus a 15% "buyer's premium" to **ELITE**) to a United States Fish and Wildlife Service ("USFWS") agent working in an undercover capacity, who informed defendants that he resided in the Commonwealth of Virginia, and in fact participated in the auction by telephone from the Commonwealth of Virginia.

7. On or about June 26, 2012, the defendants received a wire transfer of $69,000 for the horn sold on June 24, 2012, to the undercover USFWS agent from the Commonwealth of Virginia.

Sale and Smuggling of Rhinoceros Horn and Elephant Ivory Items

8. On or about May 14, 2012, in Boynton Beach, Florida, the defendants received a Black rhinoceros horn with a silver base (hereinafter referred to as "the silver horn") from "A.W.," who resided in New York, New York.

9. On or about June 19, 2012, defendants advertised via Online Auctions, the June 24, 2012, auction sale of the following: (a) the silver horn, described as "Lot 601: Antique Rhinoceros Horn in English Silver;" and (b) a raw horn from a Black rhinoceros, described as "Lot 600: Antique African Huge Rhinoceros Horn," for an "estimated price" of $50,000 to $70,000.

10. On or about June 25, 2012, in Boynton Beach, Florida, the defendants sold Lot 601, along with several items made from elephant ivory (Lot: 519, described in the advertisement as "Chinese Carved Ivory Concentric Dragons Urn;" Lot: 582, described in the advertisement as "Pair Antique Chinese Carved Ivory Quan Yin Figures;" Lot: 620, described in the advertisement as "Chinese Carved Ivory Study of Elephant & Tiger;" Lot: 723, described in the advertisement as "19th Century Japanese Carved Ivory Samurai Figure Signed;" and Lot 725, described in the advertisement as "Chinese Ivory Elephant Attach Group Figure") to "T.J.," an individual from British Columbia, Canada ("Canada Buyer").

11. On or about June 25, 2012, in Boynton Beach, Florida, the defendants made and caused to be made Invoice No. 4252, which included the following information: Canada Buyer's name and address in "Richmond, Canada;" a list of the items purchased, which were described as Lots 601, 519, 582, 723, and 725, all sold at auction on June 25, 2012; and the total cost paid as "$37,789.50," which included a "Buyer's Premium" of "$5,764.50."

12. On or about June 26, 2012, the defendants sent an email to Canada Buyer, which included instructions to wire payment to "Elite Estate Buyers Inc DBA Elite Decorative Art," for the items Canada Buyer purchased on June 25, 2012. The email also stated "Please also make shipping arrangements and send me the attached shipping release form," and included contact information for Shipper-1, including the name and contact information for the owner of Shipper-1.

13. On or about June 26, 2012, Canada Buyer sent an email to the defendants, which stated "Can you refer a shipper that can ship ivory and rhino horns to Canada to me. I have contacted [Shipper-1], he is unable to do so for me."

14. On or about June 26, 2012, the defendants sent an email to Canada Buyer, which stated "Yes, try contacting [owner of Shipper-2, along with contact information], they should be able to help you."

15. On or about June 29, 2012, Canada Buyer sent an email to the defendants, which stated "Hi, I have wired the money to you! Can you please let [Shipper-2] do the packing and shipping to me. [sic]"

16. On or about June 29, 2012, the defendants sent an email to Canada Buyer, which stated "Yes, thank you."

17. On or about July 2, 2012, the defendants received a wire transfer in the amount of $37,779.50, in Canada Buyer's name, at a branch of Bank of America, located at 13850 Wellington Drive, Wellington, Florida.

18. On or about July 2, 2012, in response to an email from Canada Buyer, which stated, "Hi, I am just wondering have you got the money yet," the defendants sent an email that

11

stated "Yes, I have, we are preparing your items and will notify the shippers once your items are ready to be picked up."

19. On or about July 10, 2012, Shipper-2, sent the items purchased by Canada Buyer on June 25, 2012, to Canada Buyer at an address in Richmond, British Columbia, Canada.

Second Interstate Sale of a Black Rhinoceros Horn to Undercover Agent

20. On or about October 15, 2012, in Boynton Beach, Florida, the defendants advertised via Online Auctions, the November 10, 2012, auction sale of a raw horn from a Black rhinoceros, which was displayed in a photograph.

21. On or about November 10, 2012, the defendants advertised on **ELITE**'s own website the horn they advertised via Online Auctions on October 15. The advertisement portrayed the horn in the identical photograph as was in the Online Auctions advertisement, and also described the horn as "Lot 101 – Antique Rhinoceros Horn…pre-sale estimate $30,000 - $50,000."

22. On or about November 10, 2012, in Boynton Beach, Florida, the defendants sold Lot 101, a horn from a Black rhinoceros, at auction for a winning bid of $36,800 ($32,000 plus a 15% "buyer's premium" to **ELITE**) to a USFWS agent acting in an undercover capacity, who informed defendants that he was participating in the auction by telephone from the Commonwealth of Virginia, and did, in fact, participate in the auction from the Commonwealth of Virginia.

23. On or about November 16, 2012, the defendants received a wire transfer in the amount of $36,800 for Lot 101, the horn sold on November 16, 2012, to the undercover USFWS agent.

Receipt and Interstate Sale of Black Rhinoceros Horn to CC-2

24. On or about December 14, 2012, in Boynton Beach, Florida, defendants accepted consignment and received two horns from a Black rhinoceros to sell at **ELITE**'s March 2013 auction from a USFWS agent acting in an undercover capacity, who represented to the defendants that he resided in Colorado, and who did, in fact, reside in Colorado (hereinafter "Colorado Consignor").

25. On or about January 16, 2013, the defendants sold the horns received from Colorado Consignor in a private sale (not at auction) to CC-2, a resident of Texas, for $55,000.

26. On or about January 23, 2013, the defendants received a wire transfer of $55,000 for the horns sold on January 16, 2013 to CC-2.

Wildlife Sold and Transported in Foreign Commerce

27. On or about January 18, 2011, in Boynton Beach, Florida, the defendants sold Lot 72, a figure carved from elephant ivory, to a purchaser in Belgium for $1,600, and then, knowing that the proper permits were not obtained, aided and abetted in shipping Lot 72 out of the United States to Belgium.

28. On or about March 13, 2012, in Boynton Beach, Florida, the defendants sold Lot 265, an object carved from elephant ivory, to a purchaser in Hong Kong for $6,700, and then, knowing that the proper permits were not obtained, aided and abetted in shipping Lot 265 out of the United States to Hong Kong.

29. On or about January 18, 2013, in Boynton Beach, Florida, the defendants sold Lot 145, a figure carved from elephant ivory, to a purchaser in Taiwan for $1,700, and then, knowing

that the proper permits were not obtained, aided and abetted in shipping Lot 145 out of the United States to Taiwan.

All in violation of Title 18, United States Code, Section 371.

SAM HIRSCH
Acting Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

By: _____
GARY N. DONNER
Trial Attorney
Environmental Crimes Section

By: _____
WIFREDO A. FERRER
United States Attorney
Southern District of Florida

By: _____
Thomas A. Watts-FitzGerald
Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | CASE NO. _____ |
|---|---|
| vs. | |
| ELITE ESTATE BUYER, INC. d/b/a ELITE DECORATIVE ARTS, and CHRISTOPHER HAYES, | **CERTIFICATE OF TRIAL ATTORNEY*** |
| Defendant. _____ / | **Superseding Case Information:** |

**Court Division**: (Select One)

\_\_\_\_ Miami        \_\_\_\_ Key West
\_\_\_\_ FTL    _X_ WPB    \_\_\_\_ FTP

New Defendant(s)            Yes \_\_\_\_    No \_\_\_\_
Number of New Defendants    \_\_\_\_
Total number of counts      \_\_\_\_

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:    (Yes or No)    _NO_
   List language and/or dialect   _____

4. This case will take _0_ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                          (Check only one)

   I    0 to 5 days      X (PLEA)       Petty      \_\_\_\_
   II   6 to 10 days     \_\_\_\_\_         Minor      \_\_\_\_
   II   11 to 20 days    \_\_\_\_\_         Misdem.    \_\_\_\_
   IV   21 to 60 days    \_\_\_\_\_         Felony     _X_
   V:   61 days and over \_\_\_\_\_

6. Has this case been previously filed in this District Court?    (Yes or No)    _NO_
   If yes:
   Judge:  _____    Case No.  _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?    (Yes or No)    _NO_
   If yes:
   Magistrate Case No.    13-08147-WM
   Related Miscellaneous numbers:    _____
   Defendant(s) in federal custody as of    _____
   Defendant(s) in state custody as of      _____
   Rule 20 from the _____ District of _____

   Is this a potential death penalty case? (Yes or No)    _NO_

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?    Yes \_\_\_\_    _X_ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?    Yes \_\_\_\_    _X_ No

_____
THOMAS WATTS-FITZGERALD
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0273538

*Penalty Sheet(s) attached

REV 4/8/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: CHRISTOPHER HAYES

**Case No**: _____

Count # 1:

Conspiracy to Traffic Protected Wildlife

Title 18, United States Code, Section 371

\* **Max. Penalty**:   Five (5) years' imprisonment

Count #:



**\*Max. Penalty:**

Count #:



**\*Max. Penalty:**

Count  #:



**\*Max. Penalty:**


\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**: ELITE ESTATE BUYERS, INC. d/b/a   ELITE DECORATIVE ARTS

**Case No**: _____

Count # 1:

Conspiracy to Traffic Protected Wildlife

Title 18, United States Code, Section 371

\* **Max. Penalty**:   $500,000 or twice gain/loss

Count #:

_____

_____

**\*Max. Penalty:**

Count #:

_____

_____

**\*Max. Penalty:**

Count #:

_____

_____

**\*Max. Penalty:**

\***Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**